**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **AMERICAN TRANSIT INSURANCE COMPANY,**<br>**Plaintiff,**<br>**-against-**<br>**CARESOFT LEASING CORP, YAKOV KHODZHAYEV, JOHN DOES 1 THROUGH 5 AND ABC CORPORATIONS 1 THROUGH 5,**<br>**Defendants.** | **CIVIL ACTION**<br>**22-CV-6398**<br>**COMPLAINT**<br>**(TRIAL BY DEMANDED)** |

Plaintiff American Transit Insurance Company (collectively "**Plaintiff**" or "**American Transit**"), by their attorneys, Morrison Mahoney, LLP, for their Complaint against Defendants Yakov Khodzhayev ("Khodzhayev"), Caresoft Leasing Corp ("Caresoft Leasing"), (Khodzhayev and Caresoft Leasing are collectively referred to herein as the "**Retail Defendants**"), John Does 1 through 5, (and ABC Corporations 1 through 5 (collectively referred to herein with the Retail Defendants as "**Defendants**") allege as follows:

## PRELIMINARY STATEMENT

1. From at least February 2017 and continuing through the date of the filing of this Complaint, Defendants engaged in a scheme to defraud automobile insurance companies, including Plaintiff, through New York State's No-fault system.

2. This action seeks to recover more than $104,900.00 that Defendants stole from Plaintiff through the submission of numerous false and/or fraudulent insurance claims for post-surgical rehabilitative durable medical equipment ("DME") and/or orthotic devices, including, in particular, pneumatic and/or cold/hot compression devices, a/k/a VascuTherm Therapy Devices, (hereinafter "Compression Devices"), and Continuous Passive Motion ("CPM") machines (collectively "Rental DME").

3.      At all relevant times mentioned herein, each and every piece of DME supplied by Caresoft Leasing was provided pursuant to a predetermined course of treatment, irrespective of medical necessity, based on illicit kickback and/or other financial compensation agreements between and among one or more of the Defendants and the No-fault Clinics, as defined below.

4.      To execute the scheme to defraud alleged herein, Defendant Khodzhayev, through Caresoft Leasing, entered into separate arrangements with one or more medical clinics operating in the New York metropolitan area that bills No-fault insurers for medical services (hereinafter "No-fault Clinics").

5.      Pursuant to these arrangements and in exchange for kickbacks and/or other financial compensation, the managers, owners and/or controllers of No-fault Clinics, which are not named as defendants in this action, facilitated the scheme in several ways, including but not limited to one or more of the following:

     i)     ensuring that their associated doctors and/or chiropractors (hereinafter "Health Care Practitioners" or "HCPs") prescribed large amounts of virtually identical DME, including Rental DME, to their patient population, pursuant to a predetermined course of treatment irrespective of medical necessity, with the prescribed items being dictated by the Defendants, among others;

     ii)    fabricating and/or falsifying DME prescriptions by:

         a)    utilizing blank prescription forms signed by their HCPs in order to unilaterally fill in the prescription with expensive and unnecessary DME:

         b)    fraudulently altering otherwise valid prescriptions issued by their HCPs by adding or changing the DME prescribed in order to conform the prescription to a pre-determined protocol designed to maximize reimbursement by insurance companies; and/or

     iii)   ensuring that the prescriptions were sufficiently generic and/or formulaic so that the nature, quality and cost and medical necessity of any DME could not be verified based on the description of the prescribed item alone.

6.      The use of generic and/or formulaic descriptions in the fraudulent prescriptions enabled the Retail Defendants to: (i) misrepresent the nature and quality of the Rental DME prescribed and dispensed to the patient, if any items were legitimately prescribed and dispensed at all; (ii) misrepresent the medical necessity of the items that were dispensed to the patient, if any items were dispensed at all; and (iii) fraudulently bill for products that would result in the highest forms of reimbursement from insurers, in general, and Plaintiff, in particular.

7.      Pursuant to the fraudulent prescriptions, Caresoft Leasing routinely provided (or purported to provide) a portion of a nearly identical battery of DME to persons injured in automobile accidents insured by Plaintiff (hereinafter "Covered Persons"), regardless of medical necessity, in order to maximize reimbursement from insurers in general, and Plaintiff in particular.

8.      On information and belief, the Retail Defendants then paid kickbacks or other forms of compensation to the No-fault Clinics for the fraudulent prescriptions, which were transmitted directly by the No-fault Clinics to the Retail Defendants to support their claims for reimbursement.

9.      On information and belief, in many instances, Khodzhayev submitted to Plaintiff, through Caresoft Leasing, prescription forms which they knew to be fabricated and/or fraudulently altered, in order to misrepresent the quality and medical necessity of the Rental DME actually prescribed by the No-fault Clinics' HCPs, if any were prescribed at all.

10.     After obtaining the fraudulent prescriptions from the No-fault Clinics Khodzhayev, through Caresoft Leasing, generated and submitted bills to Plaintiff, among others, knowingly misrepresenting the nature and quality of the items, the amounts they were entitled to be reimbursed and/or the medical necessity of the purportedly prescribed DME.

11.     In carrying out the scheme to defraud, Defendants stole in excess of $104,900.00 from Plaintiff by submitting, causing to be submitted or facilitating the submission of fraudulent

claims for persons who allegedly sustained injuries covered by the New York State Comprehensive Motor Vehicle Insurance Reparations Act, Ins. Law §§ 5101, *et seq*. (popularly known as the "No-fault Law").

**STATUTORY/REGULATORY SCHEME**

12. Pursuant to the No-fault Law, Plaintiff is required to pay, *inter alia*, for health service expenses that are reasonably incurred as a result of injuries suffered by occupants of their insured motor vehicles or pedestrians, which arise from the use or operation of such motor vehicles in the State of New York. Covered Persons can also assign these benefits to doctors and other properly licensed healthcare providers, including DME retailers, enabling them to bill insurance companies directly for their services.

13. As alleged herein, Defendants exploited and continue to exploit this system by obtaining such assignments and billing Plaintiff for DME and/or orthotic devices that were never provided, not provided as billed or, if provided, were otherwise medically unnecessary and provided pursuant to fraudulent prescriptions in conformity with a predetermined course of treatment in which virtually all Covered Persons received substantially similar DME and/or orthotic devices. Exhibit "1" in the accompanying Compendium of Exhibits is a representative sample of claims paid by Plaintiff to Caresoft Leasing for medical equipment and/or other services provided pursuant to fraudulent prescriptions based upon a predetermined course of treatment, irrespective of medical necessity.

14. Defendant Caresoft Leasing is ostensibly a DME and orthotic device supply company that bills for medical supplies provided to, among others, individuals covered under the No-fault Law. In exchange for its services, Caresoft Leasing accepted assignments of benefits

from Covered Persons and submitted claims for payment to No-fault insurance carriers, in general, and to Plaintiff, in particular.

15.     In accordance with the No-fault Law and 11 N.Y.C.R.R. §§ 65 *et seq*., Caresoft Leasing submitted bills for its claims to Plaintiff using the claim form prescribed by the New York State Department of Financial Services ("DFS," f/k/a the Department of Insurance), known as a "Verification of Treatment by Attending Physician or Other Provider of Health Service" or "NYS form NF-3" (hereinafter "NF-3"), or a substantially similar form.

16.     At all relevant times mentioned herein, pursuant to Section 403 of the New York State Insurance Law, the claim forms submitted to Plaintiff by Caresoft Leasing contained the following warning at the foot of the page:

> Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance or statement of claim containing any materially false information, or conceals for the purpose of misleading, information concerning any fact material thereto, commits a fraudulent insurance act, which is a crime….

17.     At all relevant times mentioned herein, pursuant to the No-fault Law and implementing regulations, as well as the applicable policies of insurance, Plaintiff was (and is) required to promptly process claims within 30 days of receipt of proof of claim.

18.     At all relevant times mentioned herein, Section 5108 of the No-fault Law circumscribes the amount that a licensed healthcare provider or other authorized person, such as a DME provider, may recover for health service related expenses. Under this section, such persons are only entitled to reimbursement of necessary medically related expenses in accordance with the applicable fee schedules established by the Chairman of the Workers' Compensation Board and adopted by the Superintendent of the DFS.

19.     By Opinion Letter dated June 16, 2004, entitled "No-Fault Fees for Durable Medical Equipment," the New York State Insurance Department recognized the harm inflicted on insureds by inflated DME charges:

> [A]n injured person, with a finite amount of No-Fault benefits available, having assigned his rights to a provider in good faith, would have DME items of inflated fees constituting a disproportionate share of benefits, be deducted from the amount of the person's No-Fault benefits, resulting in less benefits available for other necessary health related services that are based upon reasonable fees.

20.     At all relevant times mentioned herein, pursuant to Ins. Law § 5108, the Superintendent of the DFS adopted, by promulgation of Regulation 83, the Workers' Compensation Board ("WCB") Fee Schedules for determining the maximum permissible reimbursement amounts for which health care providers may charge for services provided to Covered Persons under the No-fault Law. 11 N.Y.C.R.R. § 68.1.

21.     At all relevant times mentioned herein,  Regulation 83 did not adopt the Workers' Compensation Fee Schedules with respect to "workers' compensation claim forms, pre-authorization approval, time limitations within which health services must be performed, enhanced reimbursement for providers of certain designated services..."

22.     Effective October 6, 2004, the Department of Financial Services, through the Superintendent's promulgation of the 28th Amendment to Regulation 83 (11 N.Y.C.R.R. § 68 *et. seq*.),  established a fee schedule for the  reimbursement of durable medical equipment and medical supplies by adopting the New York State Medicaid fee schedules for durable medical equipment, medical/surgical supplies, orthopedic footwear and orthotic and prosthetic appliances (hereinafter the "Fee Schedule"). 12 N.Y.C.R.R. § 442.2(a). (effective through June 7, 2021).  The Fee Schedule was in effect for all dates of service mentioned herein.

23.      The 28th Amendment to Regulation 83 provided:

> [The] maximum permissible charge for the purchase of durable medical equipment, medical/surgical supplies, orthopedic footwear and orthotic and prosthetic appliances is the fee payable for such equipment and supplies under the New York State Medicaid program at the time such equipment and supplies are provided. If the New York State Medicaid program has not established a fee payable for the specific item, then the fee payable, shall be the lesser of: (1) the acquisition cost (i.e. the line item cost from a manufacturer or wholesaler net of any rebates, discounts or other valuable considerations, mailing, shipping, handling, insurance costs or any sales tax) to the provider plus 50%; or (2) the usual and customary price charged to the general public.

11 N.Y.C.R.R. § 68 (Appendix 17-C, Part F) (effective through July 10, 2007).

24.      Effective July 11, 2007, for DME and/or orthotic devices provided up to and including April 3, 2022, the WCB established a fee schedule for DME and orthotic devices by also adopting the New York State Medicaid fee schedule for durable medical equipment, medical/surgical supplies, orthopedic footwear, and orthotic and prosthetic appliances. 12 N.Y.C.R.R. § 442.2(a) (effective through June 7, 2021).

25.      In view of the adoption by the WCB of the New York State Medicaid fee, on or about April 16, 2008, the DFS promulgated the 30th Amendment to Regulation 83, which repealed Part F of Appendix 17-C, since it was no longer needed due to the DFS' prior adoption of the WCB's fee schedule, which then included the Fee Schedule that was, and is, in effect at all relevant times mentioned herein.

26.      Accordingly, at all relevant times mentioned herein, providers of DME are entitled to reimbursement in the amounts set forth in the Fee Schedule.  At all relevant times mentioned herein, with respect to items not listed on the Fee Schedule (hereinafter "Non-Fee Schedule" items), the provider is only entitled to reimbursement in an amount equal to the *lesser* of either: (i) the net acquisition cost of the medical equipment to the provider, plus 50%, or (ii) the usual and

customary price charged to the public. 11 N.Y.C.R.R. § 68.1; 12 N.Y.C.R.R. § 442.2(a).  (effective through June 7, 2021).

27.     At all relevant times mentioned herein, under the Fee Schedule, providers of Rental DME were limited to a maximum permissible monthly rental charge as follows for "equipment, supplies and services provided on a rental basis shall not exceed the lower of the monthly rental charge to the general public or the price determined by the New York State Department of Health area office. The total accumulated monthly rental charges shall not exceed the fee amount allowed under the Medicaid fee schedule."  12 N.Y.C.R.R. § 442.2(b).  (effective through June 7, 2021).

28.     Furthermore, at all relevant times mentioned herein, "[t]he maximum permissible charge for the purchase of durable medical equipment, medical/surgical supplies, and orthotic and prosthetic appliances and the maximum permissible monthly rental charge for such equipment, supplies, and services provided on a rental basis as set forth in subdivisions (a) and (b) of this section are payment in full and there are no separate and/or additional payments for shipping, handling, and delivery." 12 N.Y.C.R.R. § 442.2(c) (effective through June 7, 2021).

29.     By Board Bulletin Numbers 046-1408, dated May 24, 2021, and 046-1496, dated February 3, 2022, the Chair of the WCB delayed the implementation of amendments to 12 N.Y.C.R.R. §§ 442.2, 442.4 and 442.5, which were to become effective June 7, 2021, causing the Fee Schedule to remain effective for Workers' Compensation and No-fault claims until the completion of Phase 2 of the WCB's implementation of its new electronic claims management system, OnBoard on April 4, 2022. New York Workers' Compensation Board Bulletin Nos. 046-1408 (May 24, 2021) (http://www.wcb.ny.gov/content/main/SubjectNos/sn046_1408.jsp), 046-1496 (Feb. 3, 2022) (http://www.wcb.ny.gov/content/main/SubjectNos/sn046_1496.jsp).

30.     At all relevant times mentioned herein, pursuant to Section 5108(c) of the No-fault Law, "no provider of health services . . . may demand or request any payment in addition to the charges authorized pursuant to this section."

31.     Moreover, to be eligible for reimbursement under the No-fault Law during all relevant times mentioned herein, all claims for reimbursement must include a description of the "full particulars of the nature and extent of the . . . treatment received," including DME. *See* 11 N.Y.C.R.R. § 65-1.1.

32.     At all relevant times mentioned herein, nearly each and every bill mailed to Plaintiff by Khodzhayev, through Caresoft Leasing, sought reimbursement in excess of the amounts authorized by the No-fault Law, by materially misrepresenting the DME and/or orthotic devices provided, if provided at all, as well as the cost, quality, and medical necessity of the billed-for DME and/or orthotic devices.  To the extent the DME and/or orthotic devices were provided at all, each item was medically unnecessary because it was provided pursuant to a predetermined course of treatment, irrespective of medical need, and was billed in an amount far in excess of what Caresoft Leasing was entitled to be reimbursed.

33.     In furtherance of the scheme to defraud alleged herein, Defendants, as a matter of pattern, practice, and protocol, routinely provided Covered Persons with expensive Rental DME items that were medically unnecessary and provided as part of an elaborate kickback scheme for unnecessary referrals in order to maximize reimbursement.

34.     As part of a fraudulent protocol of treatment, after receiving a standard battery of medical treatment, including the provision of several pieces of DME such as cervical pillows, cervical traction units, cold/hot water circulating pumps, EMS units, infrared heat lamps, lumbar cushions, massagers, mattresses, whirlpools; back braces, cervical collars, knee braces, and/or

shoulder braces, many of the Covered Persons are eventually referred for arthroscopic surgery at ambulatory surgical centers ("ASCs") throughout New York and New Jersey.  These surgical procedures are performed on an outpatient basis, not requiring an overnight hospital stay, and, in many cases, are not medical necessary.  On the same day as the surgery, and within a few short days after the surgery, Caresoft Leasing, among others, delivers to the Covered Persons expensive Rental DME that were not medically necessary and/or are provided pursuant to a kickback arrangement or for other financial consideration.  In many cases, the Covered Persons receive up to four or more such medically unnecessary items from the Rental DME provider, for up to 28 days or longer, in some cases exceeding $10,000.00 in a total cost for all of the items, as part of the scheme to financially enrich the Rental DME providers, and Caresoft Leasing in particular, through a fraudulent protocol of treatment, all while significantly diminishing the coverage available for medically necessary services, to the extent the Covered Persons were actually injured and in need of treatment.

35.     On information and belief, Caresoft Leasing was created for the purpose of participating in the fraudulent billing of insurance companies under the No-fault Law.

36.     On information and belief, every aspect of Defendants' fraudulent scheme was motivated by money, without regard to the grave harm inflicted on the public at large by the Defendants, who, to the extent that they provided any DME and/or orthotic devices at all, provided Covered Persons with inferior, low-quality items, or items that directly contravened the treatment plan indicated by the treating physicians, potentially compromising patients' health.

37.     The duration, scope and nature of the Defendants' illegal conduct bring this case well within the realm of criminal conduct to which the Racketeer Influenced and Corrupt Organizations Act ("RICO") applies. Defendants did not engage in sporadic acts of fraud –

although that would be troubling enough – rather, they adopted fraudulent blueprints as their business plans and used them to participate in systematic patterns of racketeering activity.  Every facet of Defendants' operations, from securing fraudulent prescriptions for DME and/or orthotic devices pursuant to a predetermined course of treatment, that misrepresented the nature, quality, cost, and medical necessity for the DME and/or orthotic devices purportedly provided, was carried out for the purpose of committing fraud.

38.     This lawsuit seeks to, among other things, enforce the plain language of the No-fault Law and implementing regulations, as well as its underlying public policy, which limits reimbursement of No-fault benefits to legitimate insurance claims for DME.  In doing so, Plaintiff seeks compensatory damages and declaratory relief that Plaintiff is not required to pay any of the Retail Defendants' No-fault claims because the Defendants, submitted (1) false and fraudulent insurance claims to Plaintiff for medically unnecessary DME and/or orthotic devices, deliberately misrepresenting the amounts they were entitled to be reimbursed; and/or (2) false and fraudulent insurance claims to Plaintiff for DME and/or orthotic devices the Defendants never actually supplied to Covered Persons.  Such claims continue to be submitted by and/or in the name of Caresoft Leasing or are, or can be, the subject of No-fault collection actions and/or arbitrations to recover benefits, and thus, constitute a continuing harm to Plaintiff.

39.     By way of example and not limitation, Exhibit "2" in the accompanying Compendium of Exhibits is a spreadsheet listing in excess of $580,400.00 in unpaid No-fault claims that form the basis of Plaintiff's request for declaratory relief.

## NATURE OF THE ACTION

40.     This action is brought pursuant to:

i)      The United States Racketeer Influenced and Corrupt Organizations Act ("RICO"); 18 U.S.C. §§ 1961, 1962(c) and 1964(c);

ii)     New York State common law; and

iii)    the Federal Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202.

## NATURE OF RELIEF SOUGHT

41.     Pursuant to 18 U.S.C. § 1964(c), Plaintiff seeks treble damages, which they sustained as a result of the Defendants' schemes to defraud and acts of mail fraud in connection with their use of the facilities of the No-fault system to fraudulently obtain payments from Plaintiff for DME and/or orthotic devices they allegedly provided to individuals covered by Plaintiff under New York State's No-fault Law.

42.     Plaintiff further seeks a judgment declaring that they are under no obligation to pay any of the Retail Defendants' unpaid No-fault claims because:

i)      The Retail Defendants made false and fraudulent misrepresentations in the bills and supporting documentation submitted to Plaintiff to obtain reimbursement far in excess of the maximum permissible amount they could submit to Plaintiff; and

ii)     The Retail Defendants made false and fraudulent misrepresentations in the bills and supporting documentation submitted to Plaintiff seeking reimbursement for DME and/or orthotic devices that was provided pursuant to a predetermined protocol of treatment without regard to medical necessity.

43.     As a result of Defendants' actions alleged herein, Plaintiff was defrauded of an amount in excess of $104,900.00, the exact amount to be determined at trial, in payments which Defendants received for fraudulently billing Plaintiff for DME and/or orthotic devices that were

never provided or, if provided, not provided as billed and/or provided pursuant to fraudulent prescriptions in accordance with a predetermined course of treatment, irrespective of medical need.

## THE PARTIES

### A. Plaintiff

44. Plaintiff American Transit Insurance Company is a corporation duly organized and existing under the laws of the State of New York, having its principal place of business in Brooklyn, New York.

45. Plaintiff is duly organized and licensed to engage in the writing of automobile insurance policies in the State of New York and provide automobile insurance coverage to their policyholders under and in accordance with New York State law.

### B. The Individual Defendant

46. Yakov Khodzhayev ("Khodzhayev") is a natural person residing in the State of New York, is the principal, officer, and/or director of Retailer Caresoft Leasing Corp and, at all times relevant herein, operated, managed, and/or controlled its activities.

### C. The Retailer Defendant

47. Caresoft Leasing Corp ("Caresoft Leasing") was incorporated on or about February 21, 2017, and purports to be a retail DME supply company, authorized to do business in the State of New York, with its principal place of business located at 70 East Sunrise Highway, Suite 500, Valley Stream, NY 11581. Caresoft Leasing is operated, managed, and/or controlled by Defendant Khodzhayev and submitted fraudulent claims to Plaintiff seeking reimbursement for DME and/or orthotic devices under the No-fault Law.

**D. The John Doe Defendants**

48. On information and belief, John Does 1 through 5 are individuals who conspired, participated, conducted, and assisted in the fraudulent and unlawful conduct alleged herein. These individuals will be added as defendants when their names and the extent of their participation become known through discovery.

**E. The ABC Corporations**

49. On information and belief, the ABC Corporations 1 through 5 are additional companies that are unknown to Plaintiff that are owned, controlled, and operated by one or more of the John Doe Defendants, which were used in connection with the kickback scheme with the Defendants alleged herein to obtain referrals, prescriptions and/or patients in furtherance of the scheme. These ABC Corporations 1 through 5 will be added as defendants when their names and the full extent of their participation become known through discovery.

**JURISDICTION AND VENUE**

50. Pursuant to 28 U.S.C. § 1331, this Court has jurisdiction over the claims brought under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961, *et seq*. because they arise under the laws of the United States.

51. This Court also has supplemental jurisdiction over the claims arising under state law pursuant to 28 U.S.C. § 1367(a).

52. Pursuant to 18 U.S.C. § 1965, 28 U.S.C. § 1367 and New York CPLR § 302(a), this Court has personal jurisdiction over any non-domiciliary defendant.

53. Venue lies in this District Court under the provisions of 18 U.S.C. § 1965(a) and 28 U.S.C. § 1391(b) as the Eastern District of New York is the district where one or more the

Defendants reside and because this is the district where a substantial amount of the activities forming the basis of the Complaint occurred.

## FACTUAL BACKGROUND AND ALLEGATIONS APPLICABLE TO ALL CAUSES OF ACTION

54. Plaintiff underwrites automobile insurance in New York State and participates as an insurer in New York State's No-fault program.

55. As set forth in the Statutory/Regulatory Scheme section above, pursuant to the No-fault Law, Plaintiff is required to pay for, *inter alia*, health service expenses that are reasonably incurred as a result of injuries suffered by occupants of their insured motor vehicles and pedestrians that arise from the use or operation of such motor vehicles in the State of New York.

56. Caresoft Leasing is ostensibly a DME supply company that bills for medical supplies provided to, among others, individuals covered under the No-fault Law. In exchange for their services, Caresoft Leasing accepts assignments of benefits from the Covered Persons covered under the No-fault Law and submits claims for payment to No-fault insurance carriers, in general, and to Plaintiff, in particular.

57. To process and verify the claims submitted by Caresoft Leasing, Plaintiff required, and Caresoft Leasing submitted, prescriptions and other documents relating to the DME and/or orthotic devices allegedly supplied to Covered Persons for which Caresoft Leasing was seeking reimbursement from Plaintiff.

58. In nearly all instances, the prescriptions submitted in support of Caresoft Leasing's claims for reimbursement were fraudulent, fabricated, and/or issued pursuant to a pre-determined treatment protocol, regardless of medical necessity.

59.     At all relevant times mentioned herein, in each bill submission to No-fault insurers in general, and Plaintiff in particular, Allbody Healing Supplies made the following representations to each recipient:

- The bill for DME and/or orthotic devices was based on a valid prescription by a healthcare practitioner licensed to issue such prescriptions;

- The prescription for DME and/or orthotic device(s) was not issued pursuant to any unlawful financial arrangements;

- The DME and/or orthotic device(s) identified on the bill was actually provided to the Covered person based on a valid prescription identifying medically necessary items;

- The billing code used on the bill actually represents the DME and/or orthotic device(s) and all included services that was provided to the Covered Person; and

- The fee sought for the billed for DME and/or orthotic device(s) did not exceed that permissible under the No-fault law and regulations.

60.     Pursuant to the No-fault Law and implementing regulations, as well as the applicable policies of insurance, Plaintiff is required to promptly process Caresoft Leasing's claims within 30 days of receipt of proof of claim.

61.     To fulfill their obligation to promptly process claims, Plaintiff justifiably relied upon the bills and documentation submitted by Caresoft Leasing in support of their claims, and paid Caresoft Leasing based on the representations and information contained in the bills and documentation that Defendants mailed to Plaintiff.

62.     At all relevant times mentioned herein, the No-fault Law provides that the maximum permissible charge for the purchase of durable medical equipment, medical/surgical supplies and orthotic and prosthetic appliances is the fee payable for such equipment and supplies under the relevant fee schedule established by the Worker's Compensation Board, as adopted by the Superintendent of the DFS. N.Y. Ins. Law § 5108; 11 N.Y.C.R.R. 68.1(a).

63. At all relevant times mentioned herein, for DME and orthotic devices, the Worker's Compensation Board has adopted the fee schedule set by the New York State Medicaid program at the time such equipment and supplies are provided. 12 N.Y.C.R.R. § 442.2. (effective through June 7, 2021).

64. At all relevant times mentioned herein, with respect to DME and/or medical supplies for which the New York State Medicaid program has not established a fee ("Non-Fee Schedule Items"), the regulation provides that the fee payable shall be the lesser of:

> (1) the acquisition cost (*i.e.*, the line item cost from a manufacturer or wholesaler net of any rebates, discounts or other valuable considerations, mailing, shipping, handling, insurance costs or any sales tax) to the provider plus 50 percent; or
>
> (2) the usual and customary price charged to the general public.

12 N.Y.C.R.R § 442.2. (effective through June 7, 2021).

65. At all relevant times mentioned herein, the regulation provides that suppliers of rental DME were limited to a maximum permissible monthly rental charge as follows: "equipment, supplies and services provided on a rental basis shall not exceed the lower of the monthly rental charge to the general public or the price determined by the New York State Department of Health area office. The total accumulated monthly rental charges shall not exceed the fee amount allowed under the Medicaid fee schedule." 12 N.Y.C.R.R. § 442.2(b) (effective through June 7, 2021).

66. Furthermore, at all relevant times mentioned herein, "[t]he maximum permissible charge for the purchase of durable medical equipment, medical/surgical supplies, and orthotic and prosthetic appliances and the maximum permissible monthly rental charge for such equipment, supplies, and services provided on a rental basis as set forth in subdivisions (a) and (b) of this section are payment in full and there are no separate and/or additional payments for shipping, handling, and delivery." 12 N.Y.C.R.R. § 442.2(c) (effective through June 7, 2021).

67.     At all relevant times mentioned herein, as a result of the WCB's delay of implementation of amendments to 12 N.Y.C.R.R. § 442.2, intended to become effective June 7, 2021, the fee schedule set by the New York State Medicaid Program and adopted by the WCB continued to set the maximum permissible charge for DME and/or orthotic devices dispensed through April 3, 2022. New York Workers' Compensation Board Bulletin Nos. 046-1408 (May 24, 2021), 046-1496 (Feb. 3, 2022).

68.     Caresoft Leasing was created in connection with an elaborate scheme to fraudulently bill No-fault insurance carriers for DME that was never provided, was not provided as billed or, if provided, was otherwise medically unnecessary and provided pursuant to a predetermined course of treatment in which virtually all Covered Persons received the same or similar battery of DME and orthotic devices.

69.     The DME and orthotic devices that Caresoft Leasing purported to provide, and for which it billed Plaintiff, seldom varied from patient-to-patient over a given period of time and also did not change based on any differences in the patients' condition, age, complaints, type of accident, or nature of alleged injury.  Instead, Khodzhayev, through Caresoft Leasing, created a billing apparatus implementing a pre-determined treatment protocol that was designed to drain the maximum amount of dollars from insurance companies for each and every patient, including those who required little or no DME at all.

70.     Khodzhayev created and controlled Caresoft Leasing, which was part of a well-organized illegal enterprise that engaged in pervasive fraudulent practices that distinguished it from legitimate providers of DME and/or orthotic devices.  The components of the enterprise followed practices that were part of a racketeering scheme dictated by Khodzhayev, including, but not limited to, the one of more of the following practices:

- Unlike legitimate retail DME companies, Khodzhayev, through Caresoft Leasing, misrepresented the nature, quality, and cost of DME and/or orthotic devices purportedly provided to Covered Persons;

- Unlike legitimate retail DME companies, Khodzhayev, through Caresoft Leasing, submitted bills to Plaintiff misrepresenting the amounts they were entitled to be reimbursed under the No-fault Law;

- Unlike legitimate retail DME companies, Khodzhayev, through Caresoft Leasing, submitted bills to Plaintiff for DME that were never provided to Covered Persons;

- Unlike legitimate retail DME companies, Khodzhayev, through Caresoft Leasing, misrepresented the usual and customary price of the Non-Fee Schedule items purportedly supplied to Covered Persons;

- Unlike legitimate retail DME companies, Khodzhayev, through Caresoft Leasing, submitted prescriptions, bills, and delivery receipts to Plaintiff for DME that generically described the item(s) so as to conceal the type of item(s) being prescribed and/or provided as well as the medical necessity for the items;

- Unlike legitimate retail DME companies, Khodzhayev, through Caresoft Leasing, concealed the fact that the DME was prescribed and supplied pursuant to a pre-determined, fraudulent protocol pursuant to a kickback or other financial arrangement with No-fault Clinics;

- Unlike legitimate retail DME companies, Khodzhayev, through Caresoft Leasing, concealed the fact that the prescription forms submitted in support of their claims for reimbursement were fabricated and/or fraudulently altered in order to maximize reimbursement regardless of medical necessity;

- Unlike legitimate retail DME companies, Khodzhayev, through  Caresoft Leasing, and/or those acting under their direction and control, had agreements and/or understandings as to what DME would be prescribed by the No-fault Clinics;

- Unlike legitimate retail DME companies, Khodzhayev, through Caresoft Leasing, arranged to have prescriptions for DME delivered to them directly by the No-fault Clinics, rather than allowing the patients to select their own DME retailers; and/or

- Unlike legitimate retail DME companies, Khodzhayev, through Caresoft Leasing, entered into illicit relationships with the No-fault Clinics, which, in exchange for kickbacks and/or a fee, provided Caresoft Leasing with prescriptions and/or referrals for Rental DME pursuant to a predetermined course of treatment, irrespective of medical necessity.

71.     In these and numerous other ways, Defendants sought to deceive Plaintiff into paying fraudulent claims that typically exceeded thousands of dollars per Covered Person.

72.     The members of the enterprise alleged herein played well-defined and essential roles in the Defendants' scheme to defraud and in directing the affairs of the enterprises.  By way of example and not limitation, in furtherance of their scheme to defraud, on information and belief, Khodzhayev engaged in one or more the following:

- Entered into kickback or other financial arrangements with No-fault Clinics, not named as defendants in this action, to (i) ensure that their HCPs prescribed large amounts of virtually identical DME to their patient population, and/or (ii) fabricate and/or fraudulently alter prescriptions issued by the HCPs, in order to conform the prescriptions to a predetermined course of treatment, irrespective of medical necessity;

- Submitted or caused to be submitted, on behalf of the Caresoft Leasing, numerous fraudulent claim forms seeking payment for DME that were purportedly (but not actually) provided to many Covered Persons;

- Submitted or caused to be submitted, on behalf of the Caresoft Leasing, prescription forms in support of requests for payment for DME, which they knew to be fabricated and/or fraudulently altered;

- Prepared or caused to be prepared fraudulent bills to be mailed to Plaintiff; and/or

- Mailed or caused those acting under their direction to mail bogus claims to Plaintiff, knowing that they contained materially false and misleading information.

73.     At all relevant times mentioned herein, Khodzhayev knew that the prescriptions provided by the No-fault Clinics were fraudulent in that they were issued pursuant to a fraudulent treatment protocol at the No-fault Clinic in connection with an unlawful referral and/or kickback scheme for medically unnecessary Rental DME.

74. At all relevant times mentioned herein, Khodzhayev, through Caresoft Leasing, directly or through others acting under and pursuant to their direction, instruction, and control, submitted or caused to be submitted the fraudulent prescription and claim forms, in furtherance of the scheme to defraud alleged herein, to obtain payment in connection with fraudulent claims.

75. At all relevant times mentioned herein, Khodzhayev and the No-fault Clinics, acting in concert with each other, participated in, conducted, controlled, conspired together, aided and abetted and furthered the fraudulent schemes through a common course of conduct and purpose, which was to defraud insurers, in general, and Plaintiff, in particular, of money.

**THE MECHANICS OF THE SCHEME TO DEFRAUD**

76. Beginning in February 2017 and continuing until the present day, Defendants and others not named in the Complaint have engaged in a systematic fraudulent billing scheme based upon the alleged provision of Rental DME to Covered Persons.

77. Khodzhayev incorporated, owned and/or controlled Caresoft Leasing for the purpose of defrauding insurers, in general, and Plaintiff, in particular.

78. Caresoft Leasing, through Khodzhayev, engaged in a pervasive scheme to defraud, wherein Khodzhayev: (i) paid kickbacks to the No-fault Clinics in exchange for prescriptions of DME and/or orthotic devices; (ii) obtained prescriptions that were provided pursuant to a predetermined course of treatment, without regard to medical necessity; (iii) obtained and submitted to insurers, in general, and Plaintiff, in particular, prescriptions which they knew to be fabricated and/or fraudulently altered; (iv) arranged for the No-fault Clinics to have assignments of benefits and acknowledgement of delivery receipt forms signed by Covered Persons on their behalf to ensure that they had all of the documents necessary to submit claims to insurers, in general, and Plaintiff, in particular; and (v) systematically submitted bills to insurers, in general,

and Plaintiff, in particular, for DME and/or orthotic devices that were purportedly provided to Covered Persons based on medical necessity when, in fact, Khodzhayev, through Caresoft Leasing, determined the DME that would be prescribed by the No-fault Clinics, with virtually every Covered Person receiving a substantially similar Rental DME for a substantially similar timeframe regardless of medical necessity.

79.    Defendants devised and carried out a scheme to fraudulently bill insurers, in general, and Plaintiff, in particular, for expensive DME that was never provided, or if provided, was provided pursuant to fraudulent prescriptions based upon a pre-determined treatment protocol, irrespective of medical necessity, materially misrepresented in their fraudulent bill submissions to Plaintiff.

80.    Regardless of whether a Covered Person was seen by a doctor on the date of the initial office visit at any of the unnamed No-fault Clinics operating in the New York metropolitan area, a Covered Person's initial office consultation would automatically trigger a series of internal practices and procedures in which the No-fault Clinics, in exchange for kickbacks and/or other financial compensation agreements, would issue a prescription for a standard battery of DME, pursuant to a standard protocol or predetermined course of treatment and regardless of whether such items were medically necessary, including but not limited to prescriptions for rental DME.

81.    Such prescriptions are issued for virtually every Covered Person, regardless of factors such as their age, height, weight, prior medical history, position in the vehicle and/or purported involvement in an accident.

82.    As part of the scheme to defraud described herein, pursuant to kickbacks or other financial compensation agreements with Caresoft Leasing, the No-fault Clinics arranged for the fraudulent prescriptions to be issued to Caresoft Leasing by: (i) causing their HCPs to write DME

prescriptions in accordance with a pre-determined protocol; and/or (ii) fabricating and/or falsifying DME prescriptions by altering the prescriptions, and filling in the prescriptions with expensive and unnecessary DME.

83.     In furtherance of the scheme to defraud alleged herein, the No-fault Clinics did not provide the Covered Persons directly with the prescriptions for DME and/or orthotic devices. Instead, Caresoft Leasing routinely provided its own, "Physician Prescription & Letter of Medical Necessity" forms in advance to the No-fault Clinics.  Such prescription forms included the Caresoft Leasing header, type of equipment, Caresoft Leasing marked off as the requested vendor, blanks for the diagnosis codes, a templated letter of medical necessity on the specific DME, as well as boxes to check off for pressure setting, frequency, protocol, and duration of need.  Thereafter, the No-fault Clinics would send back the signed prescription forms directly to Caresoft Leasing to eliminate the possibility that the Covered Person(s) would fill the prescription(s) with a legitimate retailer of DME.

84.     Furthermore, as part of the kickback or other financial compensation agreement with the No-fault Clinics and in furtherance of the scheme to defraud, on their first or second visit to the No-fault Clinic(s), the Covered Persons would be given a number of documents to complete and sign, including, but not limited to, assignment of benefit forms and one or more delivery receipts.

85.     In every instance, in furtherance of the scheme to defraud alleged herein, the delivery receipts describe the DME and/or orthotic devices in the same generic, non-descript manner as the prescriptions, and claim forms, submitted by the Caresoft Leasing in support of its claims for reimbursement.

86. In furtherance of the scheme to defraud alleged herein, the delivery receipts submitted by the Caresoft Leasing to Plaintiff routinely misrepresented the DME and/or orthotic devices provided.

87. In furtherance of the scheme to defraud and to maximize reimbursement from Plaintiff, virtually every bill submitted by Caresoft Leasing deliberately obscured all identifying information relating to the billed-for DME so as to prevent Plaintiff from determining the appropriate charges associated with any such DME or whether the specific DME and/or orthotic device was medically necessary.

88. As a matter of pattern, practice and protocol, the Retail Defendants routinely provided Covered Persons with expensive Rental DME that were medically unnecessary and provided as part of an elaborate kickback scheme for unnecessary referrals in order to maximize reimbursement.

89. Defendants' activity promoted and facilitated other acts that imposed costs onto Plaintiff well beyond the insurance proceeds that Defendants collected, including, but not limited to, Plaintiff' expenditures for verifying each fraudulent claim through examinations under oath, associated attorneys' and court reporting fees, independent medical examinations ("IMEs"), and peer reviews.

**FRAUDULENT BILLING OF RENTAL DME ITEMS**

90. In furtherance of the scheme to defraud alleged herein, Caresoft Leading, as a matter of pattern, practice and protocol, routinely provided Covered Persons with expensive Rental DME items that were medically unnecessary and provided, on information and belief, as part of an elaborate kickback scheme for unnecessary referrals in order to maximize reimbursement.

91.     As part of the scheme, the Covered Persons receiving the expensive Rental DME items were involved in minor accidents, suffering soft tissue injuries, to the extent they suffered any injuries at all, that did not require hospitalization and/or extensive medical treatment.  Shortly after the accident, the Covered Persons are referred for a standard battery of medical treatment from fraudulent "medical mill" multidisciplinary clinics where they are referred for, among other services, physical therapy, chiropractic treatment, acupuncture, and several pieces of DME and/or orthotic devices -- in some instances, receiving up to ten (10) to twelve (12) items.

92.     Months after the accident, as part of the fraudulent protocol of treatment, many of the Covered Persons are eventually referred for arthroscopic surgery at ambulatory surgical centers ("ASCs") throughout New York and New Jersey.  These surgical procedures are performed on an outpatient basis, not requiring an overnight hospital stay, and, in many cases, are not medically necessary.

93.     On the same day as the surgery, and within a few short days after the surgery, the Covered Persons are prescribed expensive rental DME and/or compression devices, related appliances, as well as other DME and/or orthotic devices as part of a pattern and protocol of treatment to maximize reimbursement for items that were not medically necessary and/or were provided pursuant to a kickback arrangement or for other financial consideration.  In many cases, the Covered Persons receive at least four or more such items, for up to 28 days or longer, in some cases exceeding $10,000.00 in a total cost for all of the items.  By way of example and not limitation, the following Covered Persons received the same or similar battery of rental DME and/or compression devices:

- In connection with claims submitted on behalf of claimant CA, claim number 1059634-02, Plaintiff was billed for twelve pieces of rental DME and/or compression devices, orthotic devices and related appliances purportedly provided by six different companies, amounting to $9,286.57 in total charges. On June 23, 2019, EZ Triboro Services Inc. ("EZ Triboro") (not named as a defendant in the Complaint) purportedly provided a SAM Professional Unit in the amount $979.30 for a fourteen day rental. On July 12, 2019, Defendant Caresoft Leasing purportedly provided a VascuTherm Device for cold/hot contrast and compression therapy in the amount of $2,212.00 rented for a twenty-eight day period, a wrap (back) in the amount of $228.00, a wrap (cervical) in the amount of $195.00, a wrap (knee) in the amount of $159.00, with an additional $150.00 fee for set-up. On July 15, 2019, ATB Services Inc. ("ATB Services") (not named as a defendant in the Complaint) provided a cervical traction device with pump in the amount of $502.63. On August 10, 2019, PRC Supplies, Inc. ("PRC Supplies") (not named as a defendant in the Complaint) purportedly provided a segmental pressure pneumatic appliance, in the amount of $272.65 for the right leg, and $272.65 for the left leg. On the same day, Sabas NY Services, Inc. ("Sabas NY")(not named as a defendant in the Complaint) purportedly provided a shoulder orthotic device in the amount of $251.34. On August 15, 2019, Triborough Orthopedics, P.C. ("Triborough Orthopedics") (not named as a defendant in the Complaint) purportedly provided a shoulder continuous passive motion device in the amount of $3,570.00 for a forty-two day rental, a cold therapy unit in the amount of $294.00 for a 14 day rental, as well as miscellaneous, unnamed equipment in the amount of $200.00.

- In connection with claims submitted on behalf of claimant DN, claim number 1060022-02, Plaintiff was billed for eleven pieces of rental DME and/or compression devices, and related appliances purportedly provided by four different companies, amounting to $7,608.71 in total charges. On August 5, 2019, Defendant Caresoft Leasing purportedly provided a VascuTherm Device for cold/hot contrast and compression therapy in the amount of $2,212.00 rented for a twenty-eight day period, a wrap (cervical) in the amount of $195.00, a wrap (back) in the amount of $228.00 and an additional $150.00 for set-up. On August 28, 2019, PRC Supplies purportedly provided a segmental pressure pneumatic appliance, in the amount of $272.65 for the right leg, and $272.65 for the left leg. On the same day, Unicast Inc. ("Unicast") (not named as a defendant in the Complaint) purportedly provided a Prothermo Ambulatory Cold Compression device in the amount of $283.00, together with a pneumatic appliance for the shoulder in the amount of $56.00. On September 5, 2019, Horizon Ortho Supply Corp. ("Horizon Ortho") (not named as a defendant in the Complaint) purportedly provided a continuous passive motion device for the left shoulder in the amount of $2,552.29 rented for a twenty-nine day period, a cold therapy circulating pump in the amount of $1,323.00 rented

for a twenty-one day period, a fluid circulating cold pad in the amount of $44.12, and a sheepskin pad in the amount of $20.00.

- In connection with claims submitted on behalf of claimant VM, claim number 1096577-01, Plaintiff was billed for eight pieces of rental DME and/or compression devices and related appliances purportedly provided by three different companies, amounting to $12,896.37 in total charges. On April 29, 2021, Recovery Ortho Solutions Inc. ("Recovery Ortho Solutions") (not named as a defendant in the Complaint) purportedly supplied a SAM Pro Unit with coupling patches in the amount of $3,683.12, rented for a fifty-six day period. On May 1, 2021, Defendant Caresoft Leasing purportedly provided a VascuTherm Device for cold/hot contrast and compression therapy in the amount of $2,212.00 rented for a twenty-eight day period, a lumbar (back) wrap in the amount of $228.00, a cervical (neck) wrap in the amount of $195.00, an additional $150.00 for set-up, and a Bracetek Onefit lumbar orthotic device in the amount of $708.65. On June 2, 2021, Cool Med Supply Inc. ("Cool Med Supply") (not named as a defendant in the Complaint) purportedly provided a PS Ultrasound Therapy System in the amount of $706.72 rented for a twenty-eight day period, and PS patches in the amount of $3,134.46. On October 1, 2021, Recovery Ortho Solutions purportedly provided a cold therapy unit, in the amount of $1,878.42 rented for a forty-two day period.

94.     On information and belief, such devices are medically unnecessary, and far less expensive and intrusive courses of treatment, such as the provision of inexpensive cold packs, would provide the same if not better treatment than the complex devices provided by the Rental Retail Defendants. In that regard, the supply of such items was motivated by money, without regard to the actual need of the patients, for the express purpose if increasing the amount of reimbursement sought from insures in general, and Plaintiff in particular.

**1.     Fraudulent billing of Compression Devices**

95.     In furtherance of the scheme to defraud alleged herein, Khodzhayev, through Caresoft Leasing, routinely submitted bills to Plaintiff for Compression Devices that were not provided as billed, supplied pursuant to fraudulent protocol of treatment, medically unnecessary and/or never provided.

96.     Each of the Covered Persons that receive Compression Devices were involved in minor impact accidents and suffered only soft-tissue injuries, to the extent they suffered any injuries at all.  By way of example and not limitation, in connection with claim numbers 1050615-01, 1063998-02, and 1096577-01, none of the Covered Persons were involved in major car accidents that resulted in significant injury or hospitalization.

97.     Shortly after the accident, each of the Covered Persons visited multidisciplinary No-fault Clinics that, in exchange for kickbacks and/or other financial compensation, referred the Covered Persons for a standard battery of treatment that included, but is not limited to, referrals for physical therapy, chiropractic treatment, acupuncture, electrodiagnostic testing and basic DME.  Indeed, with respect to DME, prior to dispensing the Compression Devices, the patients have already received a substantial and similar battery of regular and rental DME pursuant to a fraudulent protocol established by the No-fault Clinics that issue the fraudulent prescription.  By way of example and not limitation:

- In connection with claims submitted on behalf of Claimant MM, claim number 1050615-01, Plaintiff was billed for at least twenty pieces of regular DME.  On February 20, 2019, Medical Supply of NY Corp. ("Medical Supply of NY") (not named as a defendant in the Complaint) purportedly provided a water circulating heat pad with pump in the amount of $422.00, a cervical collar in the amount of $233.00, a cervical pillow in the amount of $22.04, a bed board in the amount of $101.85, a general use back cushion in the amount of $282.40, a lumbar orthotic back brace in the amount of $759.92, an electric heat pad in the amount of $20.93, an egg crate mattress in the amount of $97.50, an orthopedic car seat in the amount of $195.00, a knee orthotic brace in the amount of $208.13.  On March 28, 2019, Medical Supply of NY purportedly provided an EMS Unit in the amount of $276.25, an EMS Belt in the amount of $18.00, an infrared heating lamp in the amount of $305.00, a massager in the amount of $295.00, a whirlpool in the amount of $412.00, a knee orthotic custom fit brace in the amount of $607.55, and a cervical traction unit in the amount of $502.63. On April 2, 2019, Medical Supply of NY purportedly provide a lumber orthotic back brace custom fitted in the amount of $1,150.00. Beyond that, on April 12, 2019, Advanced Recovery Solution Inc. ("Advanced Recovery Solution") (not named as a defendant in the Complaint) purportedly provided a cold

compression unit in the amount of $2,940 rented for a forty-two day period. On May 6, 2019, Miisupply LLC ("Miisupply") (not named as a defendant in the Complaint) purportedly provided a VenaFlow Elite System w/ Cuffs, pneumatic compression device in the amount of $967.97. On May 9, 2019, Defendant Caresoft Leasing purportedly provided a continuous passive motion device for the right knee in the amount of $1,659.00, rented for a period of twenty-one days, a VascuTherm Device in the amount of $1,106.00, a wrap (knee) in the amount of $159.00, and an additional $150.00 fee for set-up. In total, Plaintiff was billed for $12,891.17 in connection with at least twenty-three pieces of DME.

- In connection with claims submitted on behalf of Claimant PF, claim number 1063998-02, Plaintiff was billed for at least twenty-five pieces of regular DME. On July 23, 2019, Union DME Corp. ("Union DME") (not named as a defendant in the Complaint) purportedly provided a general use back cushion in the amount of $282.40, a lumbar orthotic back brace in the amount of $322.98, a cervical collar in the amount of $233.00, a cervical pillow in the amount of $22.04, a dry pressure mattress in the amount of $153.13, a table, overbed in the amount of $101.85, and a thermophore in the amount of 20.93. On August 28, 2019, Big Apple Medical Equipment Inc. ("Big Apple Medical") (not named as a defendant in the Complaint) purportedly provided a lumber sacral orthotic back brace in the amount of $844.13, and a cervical traction with pump in the amount of $502.63. On September 6, 2019, Medical Supply Depot Corp. ("Medical Supply Depot") (not named as a defendant in the Complaint) purportedly provided a cervical collar in the amount of $233.00, a cervical pillow in the amount of $22.04, an orthopedic car seat in the amount of $265.00, a general use back cushion in the amount of $282.40, a lumber sacral orthotic brace in the amount of $759.92, a bed board in the amount of $101.85, and an egg crate mattress in the amount of 97.50. Thereafter, on September 16, 2019, Medical Supply Depot purportedly provide a water circulating heat pad with pump in the amount of $424.00. On October 10, 2019, Medical Supply Depot purportedly provided a lumber sacral orthotic, custom-fitted brace in the amount of $1,150.00, an EMS unit in the amount of $288.25, an EMS belt in the amount of $18.00, an infrared heat lamp in the amount of $325.00, a massager in the amount of $318.00, a hydrotherapy whirlpool in the amount of $428.00, and a cervical traction set in the amount of $502.63. Beyond that, on September 20, 2019, Defendant Caresoft Leasing purportedly provided a VascuTherm Device for cold/hot contrast and compression therapy in the amount of $2,212.00, rented for a period of twenty-eight days, a wrap (back) in the amount of $228.00, a wrap (cervical) in the amount of $195.00, a $150.00 fee for set-up, and a lumber sacral orthotic support in the amount of $741.59. In total, Plaintiff was billed for $11,225.27 in connection with at least twenty-eight pieces of DME.

- In connection with claims submitted on behalf of claimant VM, claim number 1096577-01, Plaintiff was billed for at least eighteen pieces of regular DME.   On May 6, 2021, A to Z Supply Services Inc. ("A to Z Supply") (not named as a defendant in the Complaint) purportedly provided a lumbar orthotic back brace in the amount of $759.92, a water circulating unit with pump in the amount of $485.89, a general use back cushion in the amount of $282.40, an orthopedic car seat in the amount of $265.00, a cervical collar in the amount of $233.00, a bed board in the amount of $101.85, an egg crate mattress in the amount of $97.50, a cervical pillow in the amount of $22.04, and an electric heat pad in the amount of $20.93. Subsequently on May 18, 2021, A to Z Supply purportedly provided a hydrotherapy whirlpool in the amount of $428.00, an infrared heat lamp in the amount of $325.00, a massager in the amount of $318.00, and an EMS Unit with belt in the amounts of $288.25 and $18.00, respectively. Thereafter, on May 26, 2021, A to Z Supply purportedly provided a cervical traction set for $502.63 and a custom-fit lumbar orthotic back brace in the amount of $1,150.00.   On June 26, 2021, A to Z Supply purportedly provided a wrist orthotic unit in the amount of $310.80.  Beyond that, and as set forth above, Defendant Caresoft Leasing, Recovery Ortho Solutions and Cool Med Supply purportedly provided various rental DME and/or compression devices, related appliances and/or orthotic devices.  In total, Plaintiff was billed for $15,190.58 in connection with at least twenty-six pieces of DME.

- In connection with claims submitted on behalf of claimant DN, claim number 1060022-02, Plaintiff was billed for at least nine pieces of regular DME.  On June 14, 2019, Sabas NY purportedly provided a bed board in the amount of $19.48, a cervical collar in the amount of $233.00, a cervical pillow in the amount of $22.04, a dry pressure mattress in the amount of $153.13, a lumbar cushion in the amount of $282.40, and a lumbar orthotic back brace in the amount of $322.98.  Subsequently, on July 25, 2019, Sabas NY purportedly provided a cervical traction unit with pump in the amount of $502.63, and another lumbar orthotic back brace in the amount of $844.13. On August 28, 2019, Midwood Surgical Supplies, Inc. ("Midwood Surgical Supplies") (not named as a defendant in the Complaint) purportedly provided a shoulder orthotic unit for the left shoulder in the amount of $372.50.  Beyond that, and as set forth above, Defendant Caresoft Leasing, PRC Supplies, Unicast, and Horizon Ortho purportedly provided various rental DME and/or compression devices, and related appliances.  In total, Plaintiff was billed for $10,360.05, in connection with at least twenty pieces of DME.

98.     After the initial round of unnecessary treatment, upon a follow up visit with the No-fault Clinics, in most cases, the patients are referred for surgical procedures performed at ambulatory surgical centers ("ASCs") throughout New York and New Jersey.

99.     After the surgery at the ASC, the Covered Person are purportedly provided with Compression Devices post-surgery, along with several other pieces of rental DME, related appliances, as well as other DME and/or orthotic devices.

100.     A Compression Device consists of an air pump and an inflatable jacket that encloses the limb requiring treatment. The pump fills the jacket with compressed air to predetermined pressures and intermittently alternates inflation and deflation to preset cycle times. There are three primary types of compression devices. A cold compression device which was billed for by the Defendants, is a device that consists of a device  non-segmented pneumatic compressor—single chamber that is inflated to apply uniform pressure—while circulating ice water or other chilled fluid or gel to apply cold therapy to the affected area.

101.     A Compression Device is used to improve venous circulation in the limbs of a patient suffering from edema, or the risk of deep vein thrombosis (DVT) or pulmonary embolism. The primary purpose of the device is to ensure movement of venous blood by pressurizing the tissues in the limb, thereby forcing fluids, such as blood and lymph out of the pressurized area. The pressure is later reduced, allowing for increased blood flow back into the limb.

102.     The use of Compression Devices is rarely indicated in the types of procedures performed on the Covered Persons to prevent limb edema.  In almost all cases, the prevention and/or alleviation of post-surgical edema can be done simply by using simple cold packs, compressive bandages, and elevation of the limb.

103.     The standard of care in the prevention of DVT is anticoagulation medication unless it is contraindicated.

104.     On information and belief, in some instances, Caresoft Leasing often filled prescriptions for Compression Devices within a few short days after the surgery for Covered

Persons that received multiple similar compression devices within a few short weeks of each other.

105.    By way of example and not limitation, in connection with claim numbers 1060022-02 and 1050615-01, Caresoft Leasing and/or other DME retailers not named as defendants in the Complaint, billed for multiple, similar Compression Devices for the same Covered Persons provided either on the same day post-surgery at the ASC and/or within a few days of the surgery, on rental basis for periods of 14 to 28 days.

106.    The Compression Devices supplied by Caresoft Leasing were dispensed pursuant to protocol of treatment, without regard to medical necessity as part of an elaborate scheme to supply insureds with excessive and unnecessary rental and standard DME in order to maximize reimbursement and exploit the payment formulas under the New York Medicaid Fee Schedule.

107.    By way of example and not limitation, Exhibit "3" in the accompanying Compendium of Exhibits is a representative sample of claims where Caresoft Leasing submitted fraudulent bills to Plaintiff for Compression Devices billed under code E1399 at a daily rental date of $79.00 for totals upwards of $2,212.00 for a 28 day rental, and accompanying appliances under codes A9900, E0655, E0666 and/or E0671 in amounts ranging from $55.50 to $228.00.

**2.    Fraudulent billing of Continuous Passive Motion machines**

108.    In furtherance of the scheme to defraud alleged herein, Khodzhayev, through Caresoft Leasing, routinely submitted bills to Plaintiff for Continuous Passive Motion ("CPM") devices that were not provided as billed, supplied pursuant to a fraudulent protocol of treatment, medically unnecessary and/or never provided.

109.    As a matter of pattern, practice, and protocol, Khodzhayev, through Caresoft Leasing, submitted to Plaintiff  prescription forms which they knew or should have known to be

fabricated and/or fraudulently altered, in order to misrepresent that CPM devices were medically necessary, when in fact, the CPM devices were provided, if at all, to financially enrich Khodzhayev through a fraudulent protocol of treatment.

110. CPM is a modality of post-surgical treatment in which joint motion is provided by a machine without active contraction of muscle groups. A CPM device allows passive movement to be performed to a joint for hours at a time. The theory behind CPM is that recovery will be accelerated by decreasing soft tissue stiffness, increasing range of motion, and promoting healing of joint surfaces in soft tissues, and preventing the development of adhesions. A typical CPM device consists of a carriage for support of the extremity and a controller that is programmed to passively flex and extend the joint through a set range of motion, speed, pause and duration.

111. CPM devices have no medical utility in limited post-operative circumstances, such as total knee replacements, and other knee indications including rehabilitation following repair of an anterior cruciate ligament prior to active physical therapy.

112. CPM is not medically useful as a treatment following basic arthroscopic surgical procedures, does not provide any long-term benefit to post-operative management of patients, is no more effective than standard physical therapy and is not supported by the medical literature:

- A systematic review of rehabilitation methods after arthroscopic rotator cuff repair was done by Anthony Yi, et al., and published in the journal *Sports Health* in 2015 (7:326-334) which concluded that it is unknown whether CPM offers any benefit after shoulder surgery. In addition, research has shown that CPM does not have any advantage for patients having knee surgery. For example, in patients having a total knee replacement, the American Association of Orthopedic Surgery (AAOS) has a Guideline that states: "Strong evidence supports that CPM after knee arthroplasty does not improve outcomes."

- A Cochrane Review was published that involved an analysis of multiple articles, and their conclusion was: *CPM does not have clinically important*

> *effects on active knee flexion ROM, pain, function or quality of life to justify its routine use.* In addition, in a study by Herbold, et al., a matched cohort of patients with total knee replacement were compared, and their conclusion was: *The outcome variables of sixty-one matched pairs of CPM users and non-CPM users were reported. No statistically significant differences were found in any of the outcomes.*

- A study published in the July 1998 Journal of Bone and Joint Surgery comparing the results of 31 patient randomly assigned CPM therapy or manual passive range of motion exercises for post-operative management of rotator cuff repair, found no significant differences in Shoulder Pain and Disability index scoring for pain and functional disability of each group, and no significant differences between the two groups with regard to the range of motion or strength.

- A study published in the July 16, 2014 Journal of Bone and Joint Surgery comparing the results of 40 patients post treatment of intra-articular knee fractures around the knee, randomly assigned CPM or standardized physical therapy for 48 hours immediately following surgery found that CPM significantly improved knee flexion in the first 48 hours. However, there was no significant difference in knee pain at 48 hours, no other knee flexion or extension detected at any other time and no benefit of CPM in the immediate post-operative period with regard to knee motion at six months.

113. In addition to these studies, the Centers for Medicare and Medicaid Services ("CMS") issued a National Coverage Determination concluding that CPMs are only necessary after total knee arthroplasty, anterior cruciate ligament repair or reconstruction, after cartilage grafting procedures during the non-weight-bearing period to promote healing, and surgical release of arthrofibrosis of any joint.

114. CMS also stated that CPMs should be provided within 48 hours after surgery and that there is insufficient evidence to justify the use of CPMs beyond 21 days.

115. Notwithstanding that CPM devices are not medically useful as a treatment following routine knee and shoulder arthroscopic surgical procedures such as those performed on Covered Persons, Khodzhayev, through Caresoft Leasing, and pursuant to illicit kickback

agreements with the HCPs, filled needless prescriptions for CPM devices to Covered Persons who purportedly underwent such procedures.

116.    Notwithstanding the lack of medical literature supporting the use and/or provision of CPM devices for patients that undergo routine arthroscopic procedures, as a matter of pattern, practice and protocol, such devices were routinely prescribed to Covered Persons and supplied by Caresoft Leasing pursuant to a pre-determined protocol of treatment and fraudulent scheme to maximize reimbursement.

117.    Despite the fact that CPMs are not medically necessary for the injuries suffered by most, if not all the Covered Persons, and the lack of sufficient evidence to justify their use beyond 21 days, Caresoft Leasing routinely filled prescriptions systematically provided by the HCPs for CPMs to be used for anywhere between 4 and 8 weeks.

118.    On information and belief, although CPM units can be purchased from legitimate companies for less than Caresoft Leasing's accumulated monthly charges for the particular items, Caresoft Leasing  systematically represents that the inexpensive CPMs dispensed to Covered Persons are high-quality and expensive units by submitting monthly charges that far exceed the true value of the products.

119.    Specifically, Khodzhayev, through Caresoft Leasing, routinely submitted bills to Plaintiff for the rental of CPM devices for use on joints other than the knee at $99.00 per day per patient, using billing code E0936 resulting in total charges in amounts typically ranging from $2,079.00 to $4,158.00 per patient.

120.    In addition, Khodzhayev, through Caresoft Leasing, routinely submitted bills to Plaintiff for the rental of CPM devices for use on the knee at $79.00 per day, using billing code E0935 resulting in total charges in amounts ranging from $790.00 to $3,318.00 per patient.

Exhibit "4" in the accompanying Compendium of Exhibits is a spreadsheet containing a representative sample of claims wherein the Caresoft Leasing submitted fraudulent bills for the rental of CPM Devices to Plaintiff using billing codes E0935 and/or E0936.

121. On information and belief, notwithstanding that the Medicare rate for a CPM is only $21.50 per day, the charges by Caresoft Leasing far exceed that rate, and are grossly inflated in order to maximize their reimbursement in furtherance of the scheme to defraud.

122. In addition, to avoid detection or suspicion of insurers, including Plaintiff, Caresoft Leasing often attempted to disguise the scheme by unbundling the charges.

123. For example, upon receipt of a prescription for the rental of CPM devices for upwards of 2-4 weeks, Caresoft Leasing would submit successive bills, each for ten to fourteen days of the rental. By way of example in connection with claim numbers 1079840-01, 1050615-01 and 1053956-02, Caresoft Leasing frequently unbundled their charges to disguise the total amount charged for the devices and to maximize the amount of reimbursement.

**DISCOVERY OF THE FRAUD**

124. To induce Plaintiff to promptly reimburse their claims for DME and/or orthotic devices, Defendants have gone to great lengths to systematically conceal their fraud. By way of example and not limitation:

- Khodzhayev, through Caresoft Leasing, routinely and deliberately submitted claims for reimbursement that were based on a pre-determined protocol of treatment without regard for medical necessity;
- Khodzhayev, through Caresoft Leasing, routinely and deliberately concealed that its No-fault claims were submitted pursuant to an unlawful referral, illicit kickback and/or other financial compensation arrangement between and among one or more of the Defendants and the No-fault Clinics in order to maximize reimbursement;
- Khodzhayev, through Caresoft Leasing, knowingly misrepresented and concealed that Caresoft Leasing's claims for reimbursement were based on a pre-determined protocol of treatment without regard for medical necessity

and were submitted pursuant to an unlawful referral, illicit kickback and/or other financial compensation arrangement between and among one or more of the Defendants and the No-fault Clinics in order to maximize reimbursement;

- Khodzhayev, through Caresoft Leasing, knowingly and deliberately concealed the amounts Caresoft Leasing was entitled to be reimbursed in the bills submitted to Plaintiff by mispresenting the codes and reimbursement amounts as part of the scheme to manipulate the payment formulas under the New York Medicaid Fee Schedule in order to maximize the charges that they could submit to Plaintiff and other insurers.

125. Plaintiff is under a statutory and contractual obligation to promptly and fairly process claims within 30 days. The documents submitted to Plaintiff in support of the fraudulent claims at issue, combined with the material misrepresentations, omissions and acts of fraudulent concealment described above, were designed to, and did cause Plaintiff to justifiably rely on them. As a proximate result, Plaintiff has incurred damages of more than $104,900.00 based upon the fraudulent bill submissions.

126. Based upon Defendants' material misrepresentations and other affirmative acts to conceal their fraud from Plaintiff, Plaintiff did not discover and should not have reasonably discovered that their damages were attributable to fraud until shortly before they filed this Complaint.

**FIRST CLAIM FOR RELIEF**

**AGAINST DEFENDANTS KHODZHAYEV, ABC CORPORATIONS 1 THROUGH 5 AND JOHN DOES 1 THROUGH 5**

**(RICO, pursuant to 18 U.S.C. § 1962(c))**

127. The allegations of paragraphs 1 through 126 are hereby repeated and re-alleged as though fully set forth herein.

**THE RICO ENTERPRISE**

128. At all times relevant herein, Caresoft Leasing was an "enterprise" engaged in, or the activities of which affected, interstate commerce, as that term is defined by 18 U.S.C. § 1961(4), and within the meaning of 18 U.S.C. § 1962(c).

129. From, in or about February 20, 2017 through the date of the filing of this Complaint, Defendants Khodzhayev, one or more of the ABC Corporations 1 through 5 and one or more of the John Does 1 through 5, knowingly conducted and participated in the affairs of the enterprise through a pattern of racketeering activity, including the numerous acts of mail fraud described herein and included in the representative list of predicate acts set forth in the Appendix and Compendium of Exhibits accompanying this Complaint, all of which are incorporated by reference. Defendants' conduct constitutes a violation of 18 U.S.C. § 1962(c).

130. At all relevant times mentioned herein, Defendant Khodzhayev, together with others unknown to Plaintiff, exerted control over and directed the operations of Caresoft Leasing enterprise and utilized that control to conduct the pattern of racketeering activities that consisted of creating, submitting and/or causing to be submitted the fraudulent bills and supporting documents to Plaintiff American Transit Insurance Company, that were based, in part, on the utilization of fraudulent prescriptions.

131. On information and belief, one or more of the ABC Corporations 1 through 5 and one or more of the John Does 1 through 5 participated in the scheme by prescribing DME pursuant to a predetermined course of treatment, irrespective of medical necessity, based on illicit kickback and/or other financial compensation agreements between and among one or more of the Defendants, as well as bogus documentation, to facilitate the fraudulent billing alleged in the Complaint. One or more of the ABC Corporations furnished documents that Defendant

Khodzhayev required, in furtherance of the scheme to defraud, to obtain payment from Plaintiff for fraudulent DME and/or orthotic device claims.

132. On information and belief, it was both foreseeable and the intended consequence that the documents provided by one or more of the John Does 1 through 5, through one or more of the ABC Corporations 1 through 5, would be mailed to substantiate fraudulent claims and to induce payment from Plaintiff.

**The Pattern of Racketeering Activity**
**(Racketeering Acts)**

133. The racketeering acts set forth herein were carried out on a continued basis for more than a five year period, were related and similar and were committed as part of the ongoing scheme of Defendants Khodzhayev, one or more of the ABC Corporations 1 through 5 and one or more of the John Does 1 through 5 to fraudulently bill for DME and/or orthotic devices to defraud insurers, and, if not stopped, such acts will continue into the future.

134. On information and belief, this pattern of racketeering activity poses a specific threat of repetition extending indefinitely into the future, in as much as Caresoft Leasing continues to pursue collection on the fraudulent billing to the present day.

135. As a part of the pattern of racketeering activity and for the purpose of executing the scheme and artifice to defraud as described above, Defendant Khodzhayev, with the knowledge and intent of one or more of the ABC Corporations 1 through 5 and one or more of the John Does 1 through 5, caused mailings to be made through the United States Postal Service in violation of 18 U.S.C. § 1341. The mailings were made in furtherance of a scheme or artifice to defraud Plaintiff and to induce Plaintiff to issue checks to the Caresoft Leasing enterprise based upon materially false and misleading information.

136.    Through the Caresoft Leasing enterprise, Defendant Khodzhayev submitted hundreds of fraudulent claim forms seeking payment for DME and/or orthotic devices that were purportedly (but not actually) provided to hundreds of Covered Persons as billed. The bills and supporting documents that were sent by Defendant Khodzhayev, as well as the payments that Plaintiff made in response to those bills, were sent through the United States Postal Service. By virtue of those activities, Defendants Khodzhayev, one or more of the ABC Corporations 1 through 5 and one or more of the John Does 1 through 5 engaged in a continuous series of predicate acts of mail fraud, extending from the formation of the Caresoft Leasing enterprise through the filing of this Complaint.

137.    A representative sample of predicate acts is set forth in the accompanying Appendix, which identifies the nature and date of mailings that were made by Defendant Khodzhayev, in furtherance of the scheme as well as the specific misrepresentations identified for each of the mailings.

138.    Mail fraud constitutes racketeering activity as that term is defined in 18 U.S.C. § 1961(1)(B).

139.    Each submission of a fraudulent claim constitutes a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(5).

**Damages**

140.    By reason of the foregoing violation of 18 U.S.C. § 1962(c), Plaintiff American Transit Insurance Company has been injured in their business and property and Plaintiff has been damaged in the aggregate amount presently in excess of $104,900.00, the exact amount to be determined at trial.

141. Pursuant to 18 U.S.C. § 1964(c), Plaintiff is entitled to recover from Defendants Khodzhayev, one or more of the ABC Corporations 1 through 5 and one or more of the John Does 1 through 5, jointly and severally, three-fold damages sustained by it, together with the costs of this lawsuit and reasonable attorneys' fees.

**SECOND CLAIM FOR RELIEF**

**AGAINST DEFENDANTS KHODZHAYEV AND CARESOFT LEASING**

**(Common Law Fraud)**

142. The allegations of paragraphs 1 through 126 are hereby repeated and realleged as though fully set forth herein.

143. Defendants Caresoft Leasing and Khodzhayev made material misrepresentations and/or omitted material statements in submitting No-fault claims to Plaintiff American Transit Insurance Company for payment.

144. On information and belief, each and every bill and supporting documentation submitted by Defendants Caresoft Leasing and Khodzhayev to Plaintiff set forth false and fraudulent amounts for reimbursement for DME that they purportedly supplied to Covered Persons. The false representations contained therein not only were intended to defraud Plaintiff but constitute a grave and serious danger to the Covered Persons and the consumer public.

145. On information and belief, Defendants Caresoft Leasing and Khodzhayev intentionally, knowingly, fraudulently and with an intent to deceive, submitted bills, prescriptions, and other documentation that contained false representations of material facts, including, but not limited to, the following fraudulent material misrepresentations and/or omissions of fact:

- False and misleading statements as to the nature, quality, and cost of the DME purportedly supplied to Covered Persons;

- False and misleading statements as to the amounts Caresoft Leasing was entitled to be reimbursed under the No-fault Law;

- With respect to rented DME, false and misleading statements that the items were (a) medically necessary when the items were the product of a predetermined protocol of treatment, designed to maximize the reimbursement in furtherance of a scheme to defraud without regard to the actual medical needs of the Covered Persons; and (b) that the maximum permissible monthly rental charge for such equipment, supplies and services provided on a rental basis did not exceed the lower of the monthly rental charge to the general public or the price determined by the New York State Department of Health area office, and did not exceed the amount allowed under the Fee Schedule;

- False and misleading prescriptions for the DME purportedly supplied to Covered Persons, generically describing the item to conceal the type of item being prescribed;

- False and misleading prescriptions for DME, concealing the fact that the (a) DME was prescribed and supplied pursuant to a pre-determined, fraudulent protocol whereby, Defendant Khodzhayev, through Caresoft Leasing, paid kickbacks to No-fault Clinics to induce the No-fault Clinics to direct their associated physicians and chiropractors to prescribe large amounts of substantially similar, medically unnecessary DME; (b) DME was not covered by the New York State Medicaid Fee Schedule; and (c) DME was generically described on the prescriptions, all of which was designed to permit Defendant Khodzhayev, through Caresoft Leasing, to manipulate the payment formulas and their claims submissions in order to maximize the charges that they could submit to Plaintiff and other insurers.

146.    The foregoing was intended to deceive and mislead Plaintiff into paying Defendant Caresoft Leasing's claims under the No-fault Law. Specific examples of the billing fraud alleged herein are contained in the body of this Complaint, as well as the exhibits in the accompanying Compendium of Exhibits.

147.    Defendants Caresoft Leasing and Khodzhayev knew the foregoing material misrepresentations to be false when made and nevertheless made these false representations with the intention and purpose of inducing Plaintiff to rely thereon.

148. Plaintiff did in fact reasonably and justifiably rely on the foregoing material misrepresentations and upon a state of facts, which Plaintiff was led to believe existed as a result of the acts of fraud and deception of Defendants Caresoft Leasing and Khodzhayev.

149. Had Plaintiff known of the fraudulent content of the bills, prescriptions, and delivery receipts, they would not have paid the Defendant Caresoft Leasing's claims for No-fault insurance benefits submitted in connection therewith.

150. Furthermore, the far-reaching pattern of fraudulent conduct by Defendants Caresoft Leasing and Khodzhayev evinces a high degree of moral turpitude and wanton dishonesty, which, as alleged above, has harmed, and will continue to harm the public at large, thus entitling Plaintiff to recovery of exemplary and punitive damages.

151. By reason of the foregoing, Plaintiff American Transit Insurance Company has sustained compensatory damages and been injured in their business and property in an amount as yet to be determined, but believed to be in excess of $104,900.00, the exact amount to be determined at trial, plus interest, costs, punitive damages and other relief the Court deems just.

**THIRD CLAIM FOR RELIEF**

**AGAINST DEFENDANTS CARESOFT LEASING AND KHODZHAYEV**

**(Unjust Enrichment)**

152. The allegations of paragraphs 1 through 126 are hereby repeated and realleged as though fully set forth herein.

153. By reason of their wrongdoing, Defendants Caresoft Leasing and Khodzhayev have been unjustly enriched, in that they have, directly and/or indirectly, received moneys from Plaintiff that are the result of unlawful conduct and that, in equity and good conscience, they should not be permitted to keep.

154. Plaintiff is therefore entitled to restitution from Defendants Caresoft Leasing and Khodzhayev in the amount by which they have been unjustly enriched.

155. By reason of the foregoing, Plaintiff American Transit Insurance Company has sustained compensatory damages and been injured in their business and property in an amount as yet to be determined, but believed to be in excess of $104,900.00, the exact amount to be determined at trial, plus interest, costs and other relief the Court deems just.

**FOURTH CLAIM FOR RELIEF**

**AGAINST ALL RETAIL DEFENDANTS**

**(Declaratory Judgment under 28 U.S.C. § 2201)**

156. The allegations of paragraphs 1 through 126 are hereby repeated and realleged as though fully set forth herein.

157. At all relevant times mentioned herein, each and every bill mailed by Yakubov, through Caresoft Leasing, to Plaintiff sought reimbursement in excess of the amounts authorized by the No-fault Law and New York State Medicaid Fee Schedule by materially misrepresenting the DME provided, if provided at all, as well as the cost and quality of the billed for DME.

158. To the extent the DME was provided at all, each item was medically unnecessary because it was provided pursuant to a predetermined course of treatment, irrespective of medical need.

159. At all times relevant herein, the Retail Defendants exploited the No-fault Law and New York State Medicaid Fee Schedule through the utilization of various deceptive billing tactics engineered to maximize the amount of reimbursement from insurers, in general, and Plaintiff, in particular, through the submission of fraudulent billing documents that misrepresented the

amounts the Defendants were entitled to be reimbursed, as well as the medical necessity of the items purportedly provided to Covered Persons.

160.    In view of the Retail Defendants submission of fraudulent bills to Plaintiff, Plaintiff contends that the Retail Defendants have no right to receive payment for any pending bills they have submitted because:

- The Retail Defendants made false and fraudulent misrepresentations in the bills and supporting documentation submitted to Plaintiff to obtain reimbursement far in excess of the maximum permissible charges they could submit to Plaintiff;

- The Retail Defendants made false and fraudulent misrepresentations in the bills and supporting documentation submitted to Plaintiff seeking reimbursement for DME that was provided pursuant to a predetermined protocol of treatment without regard to medical necessity.

161.    As the Retail Defendants have knowingly made the foregoing false and fraudulent misrepresentations about the DME purportedly supplied to Covered Persons and the amounts they were entitled to be reimbursed, in order to manipulate the payment formulas under the No-fault Law and New York State Medicaid Fee Schedule in their claims submissions, obtain reimbursement far in excess of the maximum permissible charges they were entitled to receive for medically unnecessary items provided pursuant to a fraudulent protocol of treatment, it is respectfully requested that this Court issue an order declaring that the Retail Defendants are not entitled to receive payment on any pending, previously-denied and/or submitted unpaid claims and Plaintiff, therefore, is under no obligation to pay any of Retail Defendants' No-fault claims.

162.    Plaintiff has no adequate remedy at law.

163.    The Retail Defendants will continue to bill and/or pursue collection from Plaintiff for false and fraudulent claims for reimbursement absent a declaration by this Court that Plaintiff has no obligation to pay the pending, previously-denied and/or submitted unpaid claims,

regardless of whether such unpaid claims were ever denied, regardless of the purported dates of service.

## JURY DEMAND

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by jury.

**WHEREFORE,** Plaintiff demands judgment as follows:

i) Compensatory damages in an amount in excess of $104,900.00, the exact amount to be determined at trial, together with prejudgment interest;

ii) Punitive damages in such amount as the Court deems just;

iii) Treble damages, costs, and reasonable attorneys' fees on the First, Claim for Relief, together with prejudgment interest;

iv) Compensatory and punitive damages on the Second, Claim for Relief, together with prejudgment interest;

v) Compensatory damages on the Third, Claim for Relief, together with prejudgment interest;

vi) Declaratory relief on the Fourth Claim for Relief, declaring that Plaintiff has no obligation to pay any No-fault claims submitted by the Retail Defendants because (1) the Defendants made false and fraudulent misrepresentations in the bills and supporting documentation submitted to Plaintiff to obtain reimbursement far in excess of the maximum permissible charges they could submit to Plaintiff; and (ii) the Defendants made false and fraudulent misrepresentations in the bills and supporting documentation submitted to Plaintiff seeking reimbursement for DME that was provided pursuant to a predetermined protocol of treatment without regard to medical necessity; and

vii) Costs, reasonable attorneys' fees, and such other relief that the Court deems just and proper.

Dated: New York, New York,
October 21, 2022

Morrison Mahoney LLP

By: /s/ Karina Trost

Robert A. Stern, Esq.
James McKenney, Esq.
Karina Trost, Esq.
Lee Pinzow, Esq.
Attorneys for Plaintiff
Wall Street Plaza
88 Pine Street, Suite 1900
New York, New York 10005
(212) 825-1212

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

**AMERICAN TRANSIT INSURANCE COMPANY,**

**Plaintiff,**

**-against-**

**CARESOFT LEASING CORP, YAKOV KHODZHAYEV, JOHN DOES 1 THROUGH 5 AND ABC CORPORATIONS 1 THROUGH 5,**

**Defendants.**

**CIVIL ACTION**

**22-CV-6398**

**COMPLAINT**

**(JURY TRIAL DEMANDED)**

# COMPLAINT

**MORRISON MAHONEY, LLP**
**ATTORNEYS FOR PLAINTIFF**
**WALL STREET PLAZA**
**88 PINE STREET, SUITE 1900**
**NEW YORK, NEW YORK 10005**
**TELEPHONE: (212) 825-1212**